Filed 8/14/26  Second Site v. Scott CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SECOND SITE, LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>PAUL SCOTT et al.,<br><br>    Defendants and Respondents. | B345427<br><br>(Los Angeles County<br>Super. Ct. No. BC723513) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen P. Pfahler, Judge.  Affirmed.

The Berglund Group, Keith W. Berglund, and Russell J. Miller for Plaintiff and Appellant.

Afifi Law Group and Faryan Andrew Afifi for Defendants and Respondents.

Plaintiff Second Site, LLC sued defendants Paul Scott, Los Angeles Wellness Center (LAWC), and others for breach of contract and related tort claims stemming from a partnership agreement for the management of LAWC and its license to operate a medical marijuana dispensary in the City of Los Angeles.[1]  After a bench trial, the court found the object of the partnership agreement was to use LAWC's dispensary license to operate three different dispensaries within the City in violation of a governing municipal ordinance; this illegal object rendered the agreement unenforceable; and the parties to the agreement were in pari delicto (at equal fault) for the illegality.  Based on these findings, the court dismissed Second Site's claims and entered judgment for defendants.  Second Site appeals.  The company contends the court misconstrued the partnership agreement's object in deeming it illegal; even if the agreement was illegal, the court erred in declining to enforce the agreement under an equitable exception to the illegality doctrine; and, notwithstanding the court's findings regarding the partnership agreement, some of the tort claims were nonetheless viable.  Finding no error on the record presented, we affirm.

**BACKGROUND**

## 1.    Cannabis Law During the Relevant Period

To understand the pertinent facts and legal issues, some background is necessary regarding the state and local cannabis laws that were in place when the parties entered their partnership agreement in September 2016.

---

[1]     The other defendants are Erba, Inc.; Sheri Shekarchian; Shawn Shekarchian; Alireza Shekarchian; Devon Wheeler; Jay Handal; and Gabriel Dezio.

### a. *California's Initial Statutory Framework for Medical Marijuana*

California first legalized limited medical use of marijuana in 1996 through the Compassionate Use Act (CUA). (See Health & Saf. Code, § 11362.5.)[2] While the CUA exempted qualified patients and their primary caregivers from state criminal liability for possession and cultivation of marijuana for personal medical use (see *id.*, subds. (d)–(e)), it did not create a commercial regulatory system, authorize dispensaries, or address distribution beyond individual patient use.

In 2003, the Legislature enacted the Medical Marijuana Program Act (MMPA), adding sections 11362.7 through 11362.83 to the Health and Safety Code. (See *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 744.) The MMPA created a voluntary identification card program and extended limited immunity to qualified patients and caregivers who "associate[d] . . . in order *collectively or cooperatively* to *cultivate* marijuana." (Health & Saf. Code, former § 11362.775; see *Qualified Patients*, at p. 744.) Our courts interpreted this provision to permit collectives and cooperatives to distribute medical marijuana to members, but only on a nonprofit basis. (See *People v. Jackson* (2012) 210 Cal.App.4th 525, 538; see also Health & Saf. Code, § 11362.765, subd. (a) ["This section does not . . . authorize any individual or group to cultivate or distribute cannabis for profit."].)

---

[2] Except as authorized by other laws, sections 11357 and 11358 of the Health and Safety Code make it a crime to possess and cultivate marijuana. (See *People v. Mower* (2002) 28 Cal.4th 457, 463.)

3

### b. *Local Regulation in the City of Los Angeles: Proposition D*

In response to a proliferation of unpermitted medical marijuana dispensaries and the attendant "crime and the negative secondary effects" associated with that proliferation, the City of Los Angeles enacted a series of local ordinances culminating in Proposition D in 2013. (L.A. Mun. Code, § 45.19.6. et seq.; see *Safe Life Caregivers v. City of Los Angeles* (2016) 243 Cal.App.4th 1029, 1034–1038 (*Safe Life*).) Proposition D generally prohibited the operation of medical marijuana businesses within the City (see L.A. Mun. Code, § 45.19.6.2, subd. A), while creating a narrow form of limited immunity for a defined subset of pre-existing dispensaries. (*Id.*, § 45.19.6.3; see *Safe Life*, at p. 1038 ["Prop. D does not provide a right for these excepted medical marijuana businesses to operate, but only limited immunity."].)

To qualify for this limited immunity, Proposition D required a medical marijuana business to satisfy several conditions, including: (1) continuous operation since at least September 14, 2007; (2) timely registration with the City Clerk; (3) possession of a valid Business Tax Registration Certificate (BTRC) as of November 13, 2007; and (4) compliance with 15 operational restrictions set forth in Los Angeles Municipal Code section 45.19.6.3, subdivisions A through O. These included restrictions on location, signage, hours of operation, and management structure. (*Ibid.*) Under Proposition D, "this limited immunity [was] available and [could] be asserted . . . only by a medical marijuana business at the *one location* identified in its original or any amended [BTRC]." (*Id.,* § 45.19.6.3, italics added.) The ordinance also prohibited the medical marijuana

4

business from having "one or more Managers who are also Managers at the same time of another medical marijuana business in the City." (*Id.,* § 45.19.6.3, subd. N).

### c.     *State Licensing Legislation*

In 2015, the Legislature enacted the Medical Marijuana Regulation and Safety Act (MMRSA), which established a dual state-local licensing system for commercial cannabis activity. (See *Safe Life, supra,* 243 Cal.App.4th at p. 1045; Bus. & Prof. Code, former § 19300 et seq.)[3]  Under the MMRSA, no medical cannabis business could operate without both a state license and local authorization.  (See Bus. & Prof. Code, former § 19320, subd. (a) ["Upon the date of implementation of regulations by the licensing authority, no person shall engage in commercial cannabis activity without possessing both a state license and a local permit, license, or other authorization."].)  State licensing, however, was not set to begin until January 1, 2018.  (*See id.*, former § 19321, subd. (c).)

During the interim period, cities retained full authority to regulate or prohibit cannabis activity.  (See Bus. & Prof. Code, former § 19321, subds. (b)–(c).)  Because Los Angeles did not issue local licenses under Proposition D, pre-existing dispensaries could continue operating only by maintaining limited immunity under the ordinance.  (See *id.,* former § 19321, subd. (c).)

In November 2016, California voters passed the Control, Regulate and Tax Adult Use of Marijuana Act, more commonly

---

[3]     The MMRSA was later renamed the Medical Cannabis Regulation and Safety Act.  (See *County of Kern v. Alta Sierra Holistic Exchange Service* (2020) 46 Cal.App.5th 82, 104 (*County of Kern*).)

known as Proposition 64. The voter initiative "legalized adult recreational use of marijuana and reduced the criminal penalties for various offenses involving marijuana, including its cultivation and possession for sale." (*County of Kern, supra,* 46 Cal.App.5th at p. 106.) After Proposition 64's passage, the Governor signed into law the Medicinal and Adult-Use Cannabis Regulation and Safety Act. (*Ibid.*; see Bus. & Prof. Code, § 26000 et seq.) The statute repealed earlier state laws on medicinal marijuana, including the MMRSA, and "created one regulatory system for both medicinal and adult-use (i.e., recreational) cannabis." (*County of Kern,* at p. 106.)

## 2. The Partnership Agreement

Scott founded LAWC in the late 1990s as a nonprofit collective with the mission to serve members of the Black LGBTQ community living with HIV.[4] The dispensary was originally located in Inglewood but, due to zoning issues, Scott had been forced to relocate it to the San Fernando Valley. He had long hoped to return the dispensary to Los Angeles, where it would be closer to his original clientele.

Glantz and Sapir formed Second Site to pursue cannabis-related business opportunities. In September 2016,

_____

[4] We draw the facts primarily from the trial court's statement of decision. Because Second Site does not challenge the sufficiency of the evidence, we presume substantial evidence supports the court's factual findings. (See, e.g., *Cletro v. Valley Stores, Inc.* (1953) 117 Cal.App.2d 709, 711; *Rosenberg v. Raskin* (1947) 80 Cal.App.2d 335, 338 ["by failing to question the sufficiency of the evidence to sustain the five findings of the trial court hereinbefore stated defendant conceded that there was substantial evidence in support of them"].)

they met with Scott to explore a potential acquisition or partnership involving LAWC. At that time, Scott held a BTRC that authorized him to operate LAWC's dispensary in Los Angeles. The parties toured Second Site's existing facilities (at Remmet Avenue and Eton Avenue in Canoga Park) and discussed a possible business relationship, including Second Site's plan to establish a new location on Melrose Avenue—a location Scott found desirable because it was closer to the community LAWC historically served.

On September 28, 2016, Scott, on behalf of LAWC, and Glantz and Sapir, on behalf of Second Site, executed the partnership agreement at the heart of this case. The one-page agreement provided the companies would "enter into a partnership agreement" for a three-year term with two three-year options to extend, and Second Site would have the "first right of refusal" should LAWC "elect to sell" its "dispensary license . . . for fair market value." LAWC would "relocate" its dispensary to a Melrose Avenue location "leased and operated by Second Site," and Glantz and Sapir would be "placed on as managing members to" LAWC "with full operational control" for the term of the agreement. In "consideration for the complete and exclusive use of [LAWC's] Dispensary license during this term and complete licensing of operations listed" in the agreement, Scott was to receive "10% of the net" from all Second Site operations and "future operations and locations within the city of Los Angeles." The agreement listed three Second Site locations, including the new Melrose facility: "1) 8010-8012 Remmet Ave. Canoga Park – 80 lights [¶] 2) 7027-7029 Eton Ave. Canoga Park – 120 lights + extraction [¶] 3) 4665 Melrose Ave. Los Angeles – 80 lights + Dispensary."

7

In addition to the above terms, the agreement provided for a monthly accounting to all partners; binding arbitration of all disputes; and mutual indemnity, except with respect to the agreement's "enforceability under California Law."

## 3. The Complaint

Second Site sued Scott, LAWC, and the other defendants for breach of the partnership agreement; breach of the implied covenant of good faith and fair dealing; fraud; unfair competition; tortious interference with prospective economic advantage; tortious interference with contract; conversion; conspiracy; money had and received; declaratory relief; aiding and abetting; and an accounting.

The operative second amended complaint alleges the parties entered into a written agreement to have Second Site's principals—Sapir and Glantz—installed as "managing members" of LAWC with "full operational control" of the dispensary. In exchange for what the agreement described as the "complete and exclusive use" of LAWC's dispensary license, the complaint alleges Scott was to receive 10 percent of the net proceeds from Second Site's operations at three locations: (1) the Remmet location; (2) the Eton location; and (3) the anticipated LAWC dispensary at the Melrose location.

Relying on Scott's representations and the agreement, Second Site allegedly commissioned a zoning and compliance analysis in connection with relocating LAWC's operations to the new site on Melrose Avenue; invested more than $3 million in improvements and equipment; and opened the dispensary at the Melrose location with Scott's knowledge and consent.

Shortly after the move, Second Site learned the Melrose location could not be used as a dispensary due to its proximity to

8

a nearby church facility. The complaint alleges Scott failed to disclose warnings he had received from the Los Angeles Police Department regarding the site, resulting in additional expenses and the need to relocate. In consultation with Scott, Second Site secured a new location on Topanga Canyon Boulevard, executed a lease on LAWC's behalf, and, in June 2017, accompanied Scott to the City's Finance Office to amend LAWC's BTRC to reflect the new address, paying the 2017 BTRC fees.

In early 2018, after Los Angeles established a priority licensing process for existing dispensaries, Second Site submitted an application on LAWC's behalf. According to the complaint, the Department of Cannabis Regulation advised Second Site that control of the address listed on the 2017 BTRC would determine priority in the event of competing claims.

However, around this time, Scott and several other defendants—including Alireza Shekarchian, his family members, and individuals associated with Erba, Inc.—allegedly conspired to seize control of LAWC and to divert its license to a different dispensary location on Pico Boulevard. The complaint alleges Scott and the other defendants gained unauthorized access to the Topanga facility, removed the original 2017 BTRC, replaced it with a photocopy, and submitted their own priority licensing application using the stolen certificate. Scott and the other defendants then allegedly caused LAWC to terminate the Topanga lease, executed a sublease for the Pico location, and submitted documentation to city officials to transfer LAWC's operations to that location.

According to the complaint, by early 2018, Scott had sold his interest in LAWC to defendant Alireza Shekarchian "and related parties," LAWC's corporate filings had been amended to

9

reflect new officers and directors aligned with Shekarchian, and LAWC began operating at the Pico location under the name "Erba."  Defendants allegedly continued to operate the dispensary using LAWC's license, obtained a temporary priority license, and generated substantial revenues, all while excluding Second Site from the business and denying it the benefit of its contractual rights, including its right of first refusal under the partnership agreement.

## 4. The Trial and Statement of Decision

After a seven-day bench trial, the court issued a statement of decision ruling in favor of defendants on Second Site's claims. Critically, while the trial court found Second Site had proven its claims for breach of contract and breach of the implied covenant, the court concluded the partnership agreement was unenforceable because its central object was illegal.[5]

---

[5] With respect to Second Site's breach of contract claim, the court found the partnership agreement stated sufficient material terms; Second Site substantially performed its obligations by relocating LAWC's operations and managing the dispensary; and Scott and LAWC breached the agreement by, among other things, removing the original 2017 BTRC, relocating LAWC to the Pico location without authorization, destroying signage at the Topanga location, and selling LAWC without providing Second Site the contractually promised right of first refusal.  For the same reasons, the court found Scott and LAWC breached the implied covenant of good faith and fair dealing by interfering with Second Site's ability to receive the benefits of the agreement. Although the court also found defendants had established their equitable-estoppel and failure-to-mitigate defenses—which would have reduced any contract damages awarded to Second Site—the court's conclusion that the agreement was illegal rendered those defenses moot.

10

Citing "Glantz['s] and Sapir's testimony, as well as the plain language of the Agreement," the court determined "the essential nature of the Agreement was to form a partnership in order to operate a medical marijuana business at three different locations"—Remmet, Eton, and Melrose—using LAWC's single BTRC, in violation of Proposition D's requirement that a dispensary operate only at the single location identified on its certificate. In that regard, the court found the Remmet and Eton locations "had no independent license or BTRC to cultivate cannabis under Proposition D" and, "[b]y their own admission, Glantz and Sapir intended to operate all of the cultivation locations under LAWC's BTRC, with none of them having its own BTRC or license." The court found two other violations that were secondary to the agreement's primary object. It found the agreement violated Proposition D's prohibition on managing more than one medical marijuana business, because "Glantz admitted that [he and Sapir] managed cultivation businesses at the Remmet and Eton facilities simultaneously" while the agreement also made them "managers of LAWC at the Melrose location." And, the court found the agreement contemplated an unlawful profit-sharing with Scott at a time when state medical marijuana law permitted only nonprofit collectives operating in accordance with local ordinances.

Having found the agreement unlawful, the court rejected Second Site's contention that equitable considerations justified partial enforcement of the "core of the Agreement." The court found both sides in pari delicto (in equal fault) for entering into the unlawful arrangement, and therefore equity would not assist either party in enforcing the illegal contract. Further, because the "central purpose of the Agreement was to have profit-sharing

11

based upon unlawfully sharing a single BTRC with multiple locations (i.e. Remmet, Eton and Melrose) to create a vertically integrated profit-sharing cultivation and distribution business across multiple locations," the court determined the contract had "a singular unlawful purpose" that could not be severed from its otherwise lawful provisions.

Finally, the trial court rejected Second Site's tort claims. With respect to fraud, the court found no evidence that Scott or any other defendant made knowingly false statements or acted with fraudulent intent, or that Second Site suffered a loss due its reasonable reliance. The court dismissed the unfair competition claim, finding Second Site failed to establish any underlying unlawful, unfair, or fraudulent conduct. And, the court rejected the conversion claim because Second Site had failed to prove ownership of, or a right to possess, LAWC's assets.

The court entered judgment for defendants. Second Site filed a timely notice of appeal.

## DISCUSSION

### 1. The Object of the Partnership Agreement Was Unlawful

"The object of a contract must be lawful when the contract is made, and possible and ascertainable by the time the contract is to be performed." (Civ. Code, § 1596; accord *id.,* § 1550 ["It is essential to the existence of a contract that there should be: [¶] . . . [¶] [a] lawful object"].) The Civil Code defines the "object of a contract" as "the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." (*Id.,* § 1595.) The object of a contract is unlawful if it is contrary to an express provision of law; contrary to the policy of express law,

though not expressly prohibited; or otherwise contrary to good morals.  (*Id.,* § 1667.)  Contracts without a lawful object are void (*id.,* § 1598), and "the rights thereto cannot be judicially enforced."  (*Vierra v. Workers' Comp. Appeals Bd.* (2007) 154 Cal.App.4th 1142, 1148; see also *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124.)

Whether a contract is illegal "is a question of law" to be determined by the court "from the circumstances of each particular case."  (*Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 349–350.)  However, unlike other interpretative tasks, the court's assessment of illegality is not necessarily confined to a written agreement's unambiguous terms.  Rather, " '[p]arol evidence is always competent to show that a written contract lawful on its face, is illegal or part of an illegal transaction.' "  (*Lebal Co. of America v. Mastrup* (1942) 51 Cal.App.2d 232, 233; accord *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 148 (*Lewis*), citing Code Civ. Proc., § 1856 [The parol evidence rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, . . . or to establish illegality or fraud."].)  "To this end, the trial court must be free to search out illegality lying behind the forms in which the parties have cast the transaction to conceal such illegality."  (*Lewis,* at p. 148.)  "When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [by the trial court] will be upheld if it is supported by substantial evidence."  (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955–956 (*Founding Members*).)

When the parties entered the partnership agreement in September 2016, the Los Angeles Municipal Code generally prohibited medical marijuana businesses from operating in the City (see L.A. Mun. Code, § 45.19.6.2, subd. A), while affording certain pre-existing dispensaries a narrow form of limited immunity under Proposition D. (*Id.*, § 45.19.6.3; see *Safe Life, supra,* 243 Cal.App.4th at p. 1038.) As stated in the ordinance, "this limited immunity [was] available and [could] be asserted . . . *only* by a medical marijuana business at the *one location* identified in its original or any amended [BTRC]." (*Id.,* § 45.19.6.3, italics added.)

The trial court determined the partnership agreement's central object was "to form a partnership in order to operate a medical marijuana business at *three different locations*"— Remmet, Eton, and Melrose—using "LAWC's *single* BTRC," in contravention of Proposition D's express pronouncement that limited immunity would be available only to a dispensary operating at the one location identified on its certificate.[6]

---

[6] As discussed, the court also found the agreement violated Proposition D because "Glantz [had] admitted that [he and Sapir] managed cultivation businesses at the Remmet and Eton facilities simultaneously" while the agreement made them "managers of LAWC at the Melrose location." (See L.A. Mun. Code, § 45.19.6.3, subd. N ["Every medical marijuana business is prohibited that has one or more Managers who are also Managers at the same time of another medical marijuana business in the City"].) And, the court found the agreement's consideration provided for unlawful profit-sharing with Scott at a time when state medical marijuana law permitted only nonprofit operations under local licensing ordinances. (See Bus. & Prof. Code, former § 19321, subds. (c)–(d).) Because we conclude the partnership agreement's primary object as determined by the

14

Because the Los Angeles Municipal Code and existing state law prohibited medical marijuana businesses that did not qualify for limited immunity (see fn. 7, *post*), and the partnership agreement sought "to apply LAWC's single BTRC across multiple sites" in violation of Proposition D's limited liability framework, the court determined the agreement was illegal and unenforceable.  (See, e.g., *Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1400 [when municipal code prohibits use or occupation " 'until the building official has issued a certificate of occupancy,' " occupancy without the certificate is "unlawful and the lease constitutes an illegal contract"].)

Second Site disputes the court's illegality determination.  It argues the partnership agreement "is not illegal on its face" because, "[p]roperly understood," the agreement governs "Second Site's operation of LAWC's Melrose dispensary using LAWC's BTRC" and it "does not say anything about how Second Site's separate cultivation sites at Remmet and Eton would be licensed or operated."  (Underlining omitted.)  Rather, in Second Site's telling, the agreement references the three locations "only because Scott's compensation is defined as '10% of the net' profit from 'all Second Site operations,' which at the time consisted of Second Site's existing locations at Remmet and Eton and the new LAWC dispensary to commence at Melrose."  Thus, Second Site says, "nothing in the Agreement required the conduct the trial

trial court—to operate dispensaries at three different locations under a single BTRC—renders the agreement illegal, we do not address these other illegality findings.

15

court deemed illegal."**7**  There are at least two problems with this argument.

First, Second Site's proffered interpretation is not the only reasonable construction of the operative contractual language. The relevant provision states:

> "In consideration for the complete and exclusive use of Los Angeles Wellness Center's Dispensary license during this term *and*

---

**7**    Second Site also contends the trial court misinterpreted Proposition D because, in the company's telling, the ordinance merely "created a condition of eligibility for immunity from City enforcement—not a substantive prohibition on private contracting," and "nothing in the ordinance declared contracts extending beyond one location void, nor did it authorize courts to invalidate private agreement on that basis."  The contention does not warrant serious consideration.  Proposition D expressly states:  "It is unlawful to own, establish, operate, use or permit the establishment or operation of a medical marijuana business, or to participate as an employee, contractor, agent or volunteer, or in any other manner or capacity in any medical marijuana business."  (L.A. Mun. Code,  § 45.19.6.2, subd. A.)  When the parties entered the partnership agreement, state law expressly authorized "the City of Los Angeles to prosecute any person or entity for a violation of, or otherwise [to] enforce, Proposition D."  (Bus. & Prof. Code, former § 19321, subd. (c).)  Thus, the only avenue for lawful operation of a medical marijuana business in the City of Los Angeles was under Proposition D's limited immunity, which was "available and [could] be asserted . . . *only* by a medical marijuana business at the *one location* identified in its original or any amended [BTRC]."  (L.A. Mun. Code, § 45.19.6.3, italics added.)  The trial court did not misinterpret the governing law in declaring the partnership agreement void for illegality.

16

*complete licensing of operations listed below*[,] Los Angeles Wellness Center, Paul Scott will receive 10% of the net from all Second Site, LLC. Operations [*sic*] and or future operations and locations within the city of Los Angeles.

> "1) 8010-8012 Remmet Ave. Canoga Park – 80 lights
> "2) 7027-7029 Eton Ave. Canoga Park – 120 lights + extraction
> "3) 4665 Melrose Ave. Los Angeles – 80 lights + Dispensary." (Italics added.)

Because it links "the complete and exclusive use of [LAWC's] Dispensary license" to the "complete licensing of operations listed below"—i.e., the Remmet, Eton, and Melrose operations—and it makes Scott's consideration contingent upon this "complete licensing," the partnership agreement is reasonably susceptible of the very construction the trial court gave it—namely, that its central object was "to form a partnership in order to operate a medical marijuana business at three different locations" by "attempting to apply LAWC's single BTRC across multiple sites." As explained in its statement of decision, the trial court based its construction on "*Glantz['s] and Sapir's testimony*, as well as the plain language of the Agreement," and it assessed this extrinsic evidence in light of the witnesses' "credibility," which the court identified as "a significant factor" in coming to its decision. (Italics added.) Because the partnership agreement is reasonably susceptible of the trial court's construction, we are compelled to accept it, notwithstanding Second Site's proffered interpretation to the contrary. (See *Founding Members, supra,* 109 Cal.App.4th at pp.

17

955–956 ["When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [by the trial court] will be upheld if it is supported by substantial evidence."].)

Second, even if the agreement's language was unambiguous and not reasonably susceptible of the court's interpretation, this still would not have precluded the court from considering extrinsic evidence to "search out illegality lying behind the forms in which the parties have cast the transaction to conceal such illegality." (*Lewis, supra,* 48 Cal.2d at p. 148.) To that end, the court found the Remmet and Eton locations "had no independent license or BTRC to cultivate cannabis under Proposition D" and, "[b]y their own admission, Glantz and Sapir intended to operate all of the cultivation locations under LAWC's BTRC, with none of them having its own BTRC or license." These factual findings— which Second Site does not challenge—support the court's conclusion that the parties made the partnership agreement "to apply LAWC's single BTRC across multiple sites" in violation of Proposition D's limited liability framework and the ordinance's general prohibition and policy against the proliferation of unlicensed medical marijuana businesses operating in the City. (See fn. 7, *ante.*) The trial court did not err in determining the partnership agreement's central object was illegal.

## 2. Equity Does Not Compel the Enforcement of an Illegal Agreement When the Parties Are In Pari Delicto

Second Site argues the trial court erred by declaring the partnership agreement void for illegality without undertaking a full equitable analysis to determine whether the agreement should nonetheless be enforced. The company maintains

18

California law requires courts to weigh a series of equitable considerations—including the parties' relative culpability, the nature and seriousness of the illegality, whether the party at greater fault would be unjustly enriched, and whether enforcement would undermine the policy of the violated law—before denying a claim based on an illegal contract. According to Second Site, had the trial court performed this analysis, it would have been compelled to conclude the alleged violations were merely technical, that Second Site was less culpable than defendants, that defendants would be unjustly enriched if not held to account for their alleged breach, and that enforcing the agreement would not frustrate the purposes of Proposition D or state cannabis law. In Second Site's telling, the court's failure to conduct this equitable inquiry—and its supposed categorical reliance on the illegality finding—constituted reversible error. We disagree.

Contrary to Second Site's premise, the trial court did not declare the agreement void based solely on illegality. The court also found the parties were in pari delicto for the illegal transaction, and equity should not lend its aid to Second Site when the company was equally at fault. That finding, coupled with our own assessment of the nature of the violation and policies of the laws that were transgressed, plainly supports the court's decision not to reward Second Site for its part in the illegal scheme. "The principle that participants to an illegal contract who are *in pari delicto* can secure no relief based on such contract" is part of the salutary rule that "he who comes into equity must come with clean hands." (*Norwood v. Judd* (1949) 93 Cal.App.2d 276, 283 (*Norwood*).)

19

As we have discussed, "the general rule" requires courts to "withhold relief under the terms of an illegal contract or agreement which is violative of public policy." (*Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218 (*Tri-Q*).) The rule's purposes are "to prevent [a] guilty party from reaping the benefit of his wrongful conduct" and "to protect the public from the future consequences of an illegal contract." (*Ibid.*) However, this general rule does "not necessarily apply to both parties to the agreement unless both are truly *in pari delicto*"—that is, at equal fault for the illegality. (*Ibid.*; see *Bodily v. Parkmont Village Green Home Owners Assn., Inc.* (1980) 104 Cal.App.3d 348, 357 ["The doctrine of *in pari delicto* (in equal fault) refers to 'the general rule that the courts will deny relief to either party who has entered into an illegal contract or bargain which is against public policy.' "].)

Our high court has described the rule against enforcement of illegal contracts and its equitable exception this way: " 'The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But the courts should not be so enamored with the Latin phrase "*in pari delicto*" that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and

20

where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.' " (*Tri-Q, supra,* 63 Cal.2d at pp. 218–219, quoting *Norwood, supra,* 93 Cal.App.2d at pp. 288–289.)

Although our courts have applied the exception in a variety of contexts, the factors to be considered are almost always the same:  the illegality must be collateral to the core purpose of the contract and technical in the sense that the agreement could have been performed lawfully; the plaintiff must be less culpable than the defendant; and enforcement must not undermine the public policy embodied in the violated statute.  (See *Tri-Q, supra,* 63 Cal.2d at pp. 218–219 [listing cases]; *Norwood, supra,* 93 Cal.App.2d at p. 283; *Denning v. Taber* (1945) 70 Cal.App.2d 253, 257 (*Denning*).)  As our Supreme Court explained in *Tri-Q*, the exception and its recognized factors are grounded in the principle that, " '[i]n some cases, . . . effective deterrence [against illegality] is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit.' " (*Tri-Q,* at p. 220, quoting *Lewis, supra,* 48 Cal.2d at p. 151.)  That principle— though well established—cannot apply where the agreement's central object is unlawful and the parties are equally at fault for the illegality.  (See, e.g., *Hooper v. Barranti* (1947) 81 Cal.App.2d 570, 577 (*Hooper*) [where parties "were *in pari delicto*" and plaintiff had to "rely upon the illegal transaction and agreement and ask for its enforcement" to establish his claim, the court would not "aid him, but must leave him as he was"].)

Here, the trial court found Second Site *was* in pari delicto with Scott for the illegal scheme to use LAWC's single BTRC as a license to operate all three Second Site dispensaries.  Second Site does not challenge the sufficiency of the evidence to support this

21

factual finding. Instead, it argues the finding is irrelevant because "*in pari delicto* is separate and distinct from the equitable-factor exceptions." Yet, in the very same sentence, Second Site also admits the in pari delicto finding "overlaps" with the "relative culpability" factor that courts must weigh in determining whether to apply the equitable exception. Then, in what appears to be a veiled effort to challenge the finding without acknowledging the credibility determinations supporting it, Second Site argues Scott was "categorically more morally culpable" because "Glantz and Sapir . . . testified they did not understand the one-BTRC-per-site or manager issues to be unlawful," while defendants "made tens of millions of dollars by fraudulently breaching the Agreement and stealing LAWC from Second Site." (Boldface omitted.) Second Site's reliance on Glantz's and Sapir's testimony is plainly inconsistent with its claim that it has "deliberately framed this appeal around legal errors only—not factual reweighing or second-guessing witness credibility" determinations. Moreover, the argument fundamentally misunderstands how courts assess the parties' relative culpability in determining whether the equitable exception applies.

Contrary to Second Site's argument, application of the equitable exception depends on the parties' relative culpability *for the illegal contract*—not on the defendant's culpability for breaching the illicit agreement. *Owens v. Haslett* (1950) 98 Cal.App.2d 829 (*Owens*) is instructive. Haslett sought to recover damages from Owens, who had performed remodeling work without a valid contractor's license, rendering the parties' contract illegal. (*Id.* at p. 831.) She argued the equitable exception should apply because she was unaware that Owens

22

lacked a license.  (*Id.* at pp. 832–833.)  The reviewing court agreed, framing the relevant inquiry this way:  "If . . . Haslett was not *in pari delicto*, if she was justifiably ignorant of the fact *which made the contract illegal*, that is, Owens' lack of license, then . . . her case [would] come within the [equitable] exception to the general rule; for if she was not *in pari delicto* the illegality of the contract would not have precluded her from recovering" under it.  (*Id.* at pp. 834–835, second italics added.)  Critically, however, the *Owens* court explained application of the equitable exception only "amounts to a recognition of the contract by the court," and the party seeking relief must still satisfy "the usual and ordinary requirements exacted of any party who seeks recovery of damages for breach by the other party."  (*Id.* at p. 835.)  Thus, as *Owens* teaches, these are two distinct inquiries:  first, whether the party seeking relief is less culpable for the illegality (i.e., not in pari delicto); and second, if she is not in pari delicto, whether the plaintiff can prove breach and damages under ordinary contract principles.  (*Ibid.*)[8]

---

[8]    *Tri-Q* is in accord.  There, the cross-defendant company's officers had insisted that a severance agreement recite fictitious consideration to give the company an improper income tax advantage.  (*Tri-Q, supra,* 63 Cal.2d at pp. 216–218.)  The cross-complainant knew about the subterfuge but executed the agreement solely to obtain the agreed purchase price for his stock, which the company conditioned on the arrangement.  (*Id.* at p. 218.)  The trial court found the parties in pari delicto and declared the agreement void.  (*Ibid.*)  Our Supreme Court reversed, concluding the company was "clearly guilty of the greater moral fault" for conceiving and insisting upon the fraudulent arrangement, while the cross-complainant entered the agreement for no "purpose other than to obtain the agreed consideration for his stock."  (*Id.* at pp. 220–221 & fn. 4.)  Having

23

Second Site's argument conflates these distinct inquiries. Its contention that Scott was more culpable because defendants "made tens of millions of dollars by fraudulently breaching the Agreement" goes entirely to conduct occurring after the illegal contract was formed—the alleged breach and its financial consequences—not to the parties' relative culpability for the illegal scheme itself. In contrast, the trial court's in pari delicto finding was properly directed at who bore responsibility for the unlawful arrangement to operate three dispensaries under a single BTRC. The trial court found Second Site and Scott equally at fault for the illegality, and Second Site does not challenge the evidence supporting this finding. Because the unchallenged in pari delicto finding establishes the parties were equally responsible for the agreement's illegality, this threshold factual predicate for the equitable exception is lacking, and the exception cannot apply regardless of what occurred in the course of performance. (See *Owens, supra,* 98 Cal.App.2d at p. 833 [the "general rule" may yield to "recognized exceptions in favor of a party who is not *in pari delicto* with the other party to the contract and who, as the more innocent of the two, seeks recovery"]; accord *Tri-Q, supra,* 63 Cal.2d at p. 218 [general rule against enforcement of illegal contracts does "not necessarily apply to both parties to the agreement *unless* both are truly *in pari delicto*" (first italics added)].)

While the trial court's in pari delicto finding is alone sufficient to affirm the judgment on the contract claims, there is

determined the parties were not in pari delicto and that the agreement should be enforced, the *Tri-Q* court remanded the matter to the trial court to determine the company's liability. (*Id.* at p. 221.)

another problem with Second Site's equity argument that warrants discussion. According to Second Site, it should be entitled to the benefit of its illegal bargain with LAWC because the violation was merely "technical" and did not transgress the public policy embodied in Proposition D and existing state cannabis laws. Relying on cases involving licensing violations (e.g., *Norwood* and *Denning*), Second Site argues the illegality here was merely "administrative in nature" and "public policy would not be served by denying Second Site relief" under the illicit bargain. The licensing cases are instructive, but not in a way that helps Second Site.

In *Denning*, two partners operated a saloon without securing individual liquor licenses for each partner as required by law. (*Denning, supra,* 70 Cal.App.2d at pp. 256–257.) The court allowed the plaintiff to maintain an accounting action after the partners terminated the business, reasoning the saloon was "illegally conducted for lack of license, as distinguished from an unlawful and forbidden enterprise." (*Id.* at p. 257.) The *Denning* court reasoned plaintiff was "not *in pari delicto* in failing to secure the license," as it was the defendant who failed to procure it, and nothing in the law prohibited the parties from operating a saloon together—the defendant had simply failed to fulfill the procedural formality of securing proper licenses, which were fully available to the partners. (*Id.* at pp. 257–258.) Further, because the plaintiff's accounting claim did "not necessarily involve the legality of the partnership agreement to conduct [the saloon business,] but depend[ed] upon the oral agreement to divide the property equally," which the partners made after voluntarily terminating the business, the court concluded the technical

25

illegality of the business should not bar plaintiff from maintaining his suit.  (*Id.* at p. 260.)

Similarly, in *Norwood*, the court reversed a judgment denying the plaintiff any share of a partnership's assets after the defendant—the plaintiff's partner—had taken the contractor's license in his own name instead of the partnership's.  (*Norwood, supra,* 93 Cal.App.2d at pp. 277–280.)  The reviewing court emphasized there was "no legal obstacle to including plaintiff's name in the application, and a partnership license could have been secured, but this, defendant did not do."  (*Id.* at p. 286.)  The *Norwood* court reasoned the illegality "involved was the failure to comply with a technical formality—it was not founded on the agreement itself."  (*Id.* at p. 290.)  Thus, in both *Denning* and *Norwood*, the courts allowed suits implicating an illegal contract notwithstanding the parties' failure to secure proper licenses, but only because the illegality was technical in the sense that the businesses were themselves lawful, and the agreements could have been performed lawfully had the parties simply obtained the licenses that were available to them.

*Hooper v. Barranti*—a case the *Norwood* court distinguished on grounds that manifestly apply here—is also instructive.  (See *Norwood, supra,* 93 Cal.App.2d at pp. 289–290 [distinguishing *Hooper*].)  In *Hooper*, the parties' agreement expressly contemplated their partnership would operate a business that was legally ineligible to hold a liquor license because one partner was not a citizen and only citizens could lawfully hold a liquor license.  (*Hooper, supra,* 81 Cal.App.2d at pp. 572–573, 575.)  The reviewing court affirmed the judgment voiding the agreement, explaining that, unlike the merely technical licensing failures in *Denning*, the agreement was

26

"illegal from its inception" because the contemplated performance was structurally prohibited, and the parties "were *in pari delicto*," as the plaintiff "knew that at all times the partnership was conducting the business . . . that neither it, nor he individually, was qualified to receive or had received a license." (*Id.,* at pp. 577, 579.)  Under those circumstances, a court "cannot aid" the party seeking enforcement, "but must leave him as he was."  (*Id.* at p. 578.)

This case is much more like *Hooper*, than it is like *Denning* or *Norwood*.  The violation here was not a technical omission— e.g., a license that could have been obtained but was not.  Under Proposition D, there was no license available that would have permitted Second Site to operate three dispensaries using LAWC's single BTRC.  On the contrary, the ordinance expressly confined limited immunity to a dispensary operating at "the one location identified in its original or any amended [BTRC]."  (L.A. Mun. Code, § 45.19.6.3.)  Like the prohibition against issuing a liquor license to a noncitizen in *Hooper*, Proposition D's one-location condition was not a procedural requirement that could have been satisfied by a different application or a properly filed form—it was a categorical prohibition on the very object of the partnership agreement.  (See *Hooper, supra,* 81 Cal.App.2d at pp. 575–577.)

Moreover, the agreement's object contravened one of the central policy objectives that Proposition D sought to advance. As stated in the ordinance's recitals, the City enacted Proposition D to curb the "proliferation of unauthorized medical marijuana businesses" and the "increase in crime and the negative secondary harms" associated with the proliferation by granting a limited immunity to only those businesses that were

27

operating and had a BTRC on or before November 13, 2007. (See L.A. Mun. Code, § 45.19.6.3, subd. A; see also *id.*, § 45.19.6.) The partnership agreement's object to operate three dispensaries using LAWC's single BTRC plainly would have undermined this anti-proliferation objective. Thus, because the agreement was "illegal from its inception" and the performance it contemplated was impossible to accomplish without violating public policy, Second Site stands in precisely the position the *Hooper* court described: it must "rely upon the illegal transaction and agreement and ask for its enforcement" "to establish [its] claim," and the court therefore "cannot aid [it], but must leave [it] as [it] was."**9** (*Hooper, supra,* 81 Cal.App.2d at pp. 577–578.)

Finally, there is no merit to Second Site's contention that the penalties specified in Proposition D implicitly preclude a court from voiding an agreement that violates the ordinance. (See, e.g., *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 436 [" 'In some cases . . . the statute making the conduct illegal, in providing for a fine or

---

**9** *Asdourian v. Araj* (1985) 38 Cal.3d 276 and *Aghaian v. Minassian* (2021) 64 Cal.App.5th 603 are distinguishable for the same reasons. In each of those cases, the illegality arose from a technical or collateral failure to comply with a licensing or regulatory requirement that, if performed, would have rendered the agreement lawful. (See *Asdourian*, at pp. 290–294 [oral home improvement contracts would have been legal had they been in writing, and enforcing the agreements would not defeat the statute's purpose, as defendant was "a real estate investor, not an unsophisticated homeowner or tenant"]; *Aghaian*, at pp. 621, 623–625 [contract to sell land in Iran could have been lawful had defendant obtained licenses from United States Office of Foreign Asset Control].)

administrative discipline, *excludes by implication* the additional penalty involved in holding the illegal contract unenforceable.' "].) Proposition D authorizes nuisance-abatement proceedings against medical marijuana businesses that violate its provisions (see L.A. Mun. Code, § 45.19.6.7; see also *id.*, § 12.27.1 [nuisance abatement]), and Second Site acknowledges "hundreds of [medical marijuana businesses] were shut down through City Attorney actions, administrative nuisance proceedings, and injunctions under Proposition D's enumerated enforcement mechanisms." There is no meaningful difference between shutting down unlicensed marijuana businesses for violating Proposition D and voiding an agreement that had as its principal object the illegal operation of similarly unlicensed businesses. (Cf. *MW Erectors,* at pp. 435, 440–441 [where contractor was licensed during performance and only unlicensed at contract execution, equity would not be served by "extend[ing] the harsh sanction of forfeiture beyond the bounds set by the Legislature absent a showing that such a result is essential to effectuate the statute's protective purposes"].) The trial court correctly concluded Second Site could not obtain the benefit of its illicit bargain when it was in pari delicto for the illegality.

3. **The Trial Court Correctly Dismissed the Tort Claims**

Second Site contends the trial court erred in dismissing its fraud, conversion, and unfair competition claims, asserting these causes of action were "separate and distinct" from the illegal partnership agreement. The argument does not warrant lengthy discussion. Our review of the operative complaint confirms each tort theory depended entirely on rights Second Site claimed under the unenforceable agreement.

In support of its fraud claim, Second Site alleged Scott "made promises about material matters in *the Agreement* without any intention of performing," and Second Site, in "justifiable reliance upon Scott's promises, . . . entered into *the Agreement* and . . . perform[ed] all material obligations." (Italics added.) The trial court rejected the claim, finding no evidence of fraudulent intent or justifiable reliance. On appeal, Second Site argues Scott committed fraud, after "*the Agreement* was signed" and "following [LAWC's] relocation to Topanga," by "deliberately and methodically diverting LAWC's assets and license." (Italics added.) But Second Site had no cognizable interest in "LAWC's assets and license" independent of the partnership agreement, and it could not have justifiably relied on any representation concerning those assets absent a legally permissible contract. The trial court properly dismissed the claim.

The conversion claim fares no better. Second Site alleged that, "[a]fter Plaintiff and LAWC entered into *the Agreement*, Plaintiff had the right to immediate possession of all of LAWC's assets as well as its assets obtained from its operations." (Italics added.) The trial court dismissed the claim, concluding Second Site failed to prove "it had a right to ownership or a right to possess LAWC's assets." On appeal, Second Site argues "*the parties' Agreement* expressly designated Glantz and Sapir as 'managing members' of LAWC," thus establishing their "ownership interest in the company" as "equity owner[s]." (Italics added.) Again, because Second Site's asserted possessory interest derives solely from an illegal and unenforceable agreement, the trial court correctly dismissed the conversion claim.

The unfair competition claim is no different. Second Site alleged defendants engaged in unfair competition by obtaining a

30

temporary license to operate LAWC at the Pico location while "acting with asserted but no true authority in light of the terms of *the Agreement* giving full operational control of LAWC to Plaintiff." (Italics added.) The trial court dismissed the claim, finding Second Site had failed to prove a "wrong in the business context" that violated the unfair competition law. On appeal, Second Site says it "presented ample evidence of fraud," including "Scott's *post-formation* misconduct, breach of fiduciary duties, and concealment of material facts." (Italics added.) But, again, each alleged wrong arises from rights and obligations that exist only under the illegal partnership agreement. Because the agreement is void and unenforceable due to illegality, the derivative unfair competition claim necessarily fails. The trial court did not err in dismissing Second Site's tort claims.

## DISPOSITION

The judgment is affirmed.  Defendants Paul Scott and Los Angeles Wellness Center are entitled to costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.

We concur:



EGERTON, Acting P. J.



ADAMS, J.